# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

TONY RAPATZ, ALICE GUERRA, and
KATHERINE GUERRA,

        Plaintiffs,

vs.                                            Case No.: 12-CV-00827 RHS/LFG

JOE MARTINEZ, individually;
CHRISTIAN LOPEZ, individually;
ROBERT VIGIL, individually;
DANNY PACHECO, individually; and
CITY OF ESPANOLA EMPLOYEES and SUPERVISORS JOHN/JANE DOES 1 through 5, individually,

## SECOND MOTION TO AMEND OR SUPPLEMENT COMPLAINT AND FOR A STAY OF DEFENDANTS' CITY OF ESPANOLA'S MOTION TO DISMISS UNDER RULE 12(b)(6) AND CONSOLIDATED MEMORANDUM

COMES NOW the Plaintiffs by and through their counsel, the New Mexico Firm, LLC, [Nathaniel V. Thompkins] pursuant to Local Rule 15.1 – Amended and Supplemental Pleadings, moves this Honorable Court for leave to amend or supplement the Complaint to read as the Third Amended Complaint, attached hereto as Exhibit A. Further, Plaintiffs requests that the Court Stay the Defendant's, City of Espanola, Motion to Dismiss *[Doc.52]* until it has ruled on the instant Motion. As grounds for this motion, Plaintiff states as follows:

1. Since the filing of the initial complaint and Defendants' Motion to Dismiss under 12(b)(6) filed on April 29, 2013, *[Doc.52]*, Plaintiffs have discover new facts and evidence from the depositions of the Defendants, Officer Robert Vigil, taken on June 17, 2013; Depositions of Officer Jeremy Apodaca and Chief of Police Joe Martinez taken on June 19, 2013; and the City of Espanola's Human Resources Analyst Stephanie F. Martinez, take on July 3, 2013.

2. The evidence, including documents attached the depositions, supports Plaintiffs' claims, in their Third Amended Complaint that the Defendants, City Of Espanola, had developed and maintained practices, policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Espanola, New Mexico, such as the Plaintiffs.

3. Defendant's practices, policies or customs alleged in the Third Amended Complaint were the 'moving force' behind the constitutional injuries suffered by the Plaintiffs.

4. Plaintiffs' states that justice requires that this Court allow the instant Motion to file a Third Amended Complaint as set forth in Exhibit A attached hereto.

5. Plaintiffs have discussed their desire to file the instant Motion and Third Amended Complaint with opposing counsel who does not concur in the instant Motion.

6. Plaintiffs in the instant Motion for Leave to Amend respectfully request a stay of the Motion to Dismiss filed by the Defendant City of Espanola and the Response which is due on July 29, 2013, until such time that the Court can properly consider the instant Motion.

## **CURRENT POSTURE OF THE CASE**

7. Plaintiffs filed their Complaint on July 12, 2012. *[Doc.1]*;

8. Plaintiffs' First Amended Complaint was filed on July 301, 2012. *[Doc.3]*;

9. Defendants' Answers and Amended Answers to the First Amended Complaint were filed respectively on:

   a. September 19, 2012 by City of Espanola *[Doc.5]*;

   b. September 21, 2012 by Defendant Joe Martinez *[Doc.13]* and Amended Answer on January 15, 2013 *[Doc.30]*;

   c. September 21, 2012 by Defendant Danny Pacheco *[Doc.11]* and Amended Answer on January 15, 2013 *[Doc.31]*;

   d. September, 24, 2012 by Defendant Robert Vigil *[Doc.16]* and Amended Answer on January 15, 2013 *[Doc.30]*;

  e. January 10, 2013, by Defendant Christian Lopez *[Doc.22]* and Amended Answer January 15, 2013 *[Doc.29]*.

10. JSR was filed on January 10, 2013 *[Doc.21]* and the Order approving the JSR was filed on January 14, 2013 *[Doc.27]*;

11. The Defendant City of Espanola filed a Motion to Dismiss under Rule 12 (b)(6) on April 29, 2013. *[Doc.52]*;

12. Defendants Joe Martinez and Christian Lopez filed Motions to Dismiss based upon Qualified Immunity. *[Doc.54]*;

13. In discussions with counsel for Defendant, Robert Cole, and given the then scheduled settlement conference on July 19, 2013, Plaintiffs and Defendants agreed to grant Plaintiffs two extensions for both Motions, respectively, *[Doc.53]* filed May 11, 2013; *[Doc.56]* filed on May 23, 2013; and *[Doc.57* and *Doc.58]* both filed on June 6, 2013. Plaintiffs' Response to the City's Motion to Dismiss is currently due on Monday, July 29, 2013; and Response to Motion to Dismiss on Qualified Immunity is due on Wednesday, July 31, 2013.

14. An Order Staying Discovery was entered by the Court on May 14, 2013, based upon Defendants' filing of the Motion based upon Qualified Immunity. *[Doc.55]*.

15. No discovery has been conducted in this case and Plaintiffs will request that the Court allow limited discovery to adequately prepare for and respond to Defendants' Motions for Qualified Immunity was well as the instant Motion to Dismiss.

# I.

## LEGAL ARGUMENT

**A. LEAVE TO AMEND SHOULD BE FREELY ALLOWED**

As held in *De Franco v. U.S.* 18 F.R.D. 156, 159-60 (S.D. CA 1955):

"The general purpose of the Federal Rules of Civil Procedure is to see that actions are tried on the merits, and to dispense with technical procedural problems. To fall back on a technicality and refuse to permit a case to come to issue on the merits is to sap the very heart out of the rules and to obviate the very purpose for which they are intended.3 In giving effect to this purpose, amendments pursuant to *Rule 15, of Fed Rules Civ. Proc., Title 28 U.S.C.A. should be freely allowed avoiding delay or complete frustration of a determination of the case on the merits. Rule 15 provides and, placing substance over form, the courts have with increasing liberality allowed amendments to the pleadings when justice so requires.*"

## II.

**B. NEWLY DISCOVERED EVIDENCE OF PRACTICES, POLICIES OR CUSTOMS EXHIBITING DELIBERATE INDIFFERENCE[1]**

In order to state a claim under 42 U.S.C. § 1983 against a governmental entity, a plaintiff must prove that the constitutional deprivation was caused by that entity's policy, practice, custom or procedures, whether formal *or informally established*. (Italics ours) Local governments may be sued for constitutional deprivations visited pursuant to governmental "custom" *even though such a custom has not received formal approval through the body's official decision-making channels*". Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978)(Italics ours). *Monell* also allows the imposition of governmental liability when the *conduct reflects "practices of state officals so permanent and well settled as to constitute a 'custom or usage'* with the force of law. *Monell,* 436 U.S. at 691. See also *Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991).

"A finding of municipal liability does not depend automatically or necessarily on the liability of any police officer." *Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3rd Cir. 1984); See also *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir.1992) (*per curiam*) ("the police chief

---

[1] The newly discovered documents and depositions are from a case captioned *Gallegos et al. vs. City of Espanola*, Case 1:12-cv-00224-RHS-KBM. The documents and depositions herein cited are either public records or have not been designated as confidential by any parties pursuant to the Court's confidentiality Order.

and city might be held liable for improper training or improper procedure even if [the individual officer] is exonerated, since they put an officer on the street who is so badly trained"). If we conditioned municipal liability on an individual police officer's liability in every case, it might lead to illogical results. *Id.* It is easy to imagine a situation where an improperly trained police officer may be ignorant of the danger created by his actions and inflicts injury. Meanwhile, the city's policymakers, with a wealth of information available to them, are fully aware of those dangers but deliberately refuse to require proper training. The officer may escape liability because his conduct did not "shock the conscience." It does not follow, however, that the city should also escape liability. The city caused the officer to deprive the plaintiff of his liberty; *the city therefore has violated the plaintiff's Fourteenth Amendment rights.* See Barbara Kritchevsky, *Making Sense of State of Mind: Determining Responsibility in Section 1983 Municipal Liability Litigation,* 60 Geo.Wash.L.Rev. 417, 457-59 (1992). *Id.* (Italics ours). Acts of omission, as well as commission, may serve as the predicate for a finding of unconstitutional policy or custom. See, *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (holding that "[t]he decision *not to take any action to alleviate the problem of detecting missed arraignment*s constitutes a policy for purposes of § 1983 municipal liability"). (Italics ours).

    Liability requires a showing that such policies were a "deliberate or conscious choice." <u>Hunt v. Cent. Consol. Sch. Dist.</u>, CIV 11-1144 JB/WDS, 2013 WL 3214928 (D.N.M. June 12, 2013). The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* (emphasis in original)). These standards apply for allegations of liability based on *failure to train* and for "*official de facto policies*" that arise from "failing to adopt various policies to adequately protect" a class of persons. *Id.* citing, *Barney v. Pulsipher,* 143 F.3d at 1367, 1309 n. 8. In *City of Canton, Ohio v. Harris,* 489 U.S.

378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989), the Court held that the *inadequacy of police training may serve as the basis for municipal liability under section 1983* if the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come in contact. (Italics ours). "[W]hen the municipality has *actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm,"* it is liable. *Id.* citing, *Barney v. Pulsipher,* 143 F.3d at 1307. (Italics ours).

The depositions of the Defendants, Officer Robert Vigil and Chief of Police Joe Martinez, provide evidence of a policy, custom and/or practice for which the City of Espanola should be held liable. The policy, custom and practice, as testified to by the City's Human Resources Analyst, Stephanie F. Martinez, was well settled and constituted a 'custom or usage' with the force of law. The periods of time involved in testimony in each of the depositions overlap the relevant periods of times in the instant matter. The City's policy, customs and practices are deliberately indifferent to the constitutional rights of the citizens of Espanola including the instant Plaintiffs.

1. **The City's policymakers adopted a policy, custom and practice of deliberately ignoring the EPD Directives regarding background check requirements which lead to a violation of Plaintiffs' constitutional rights**

In *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986), a majority of the Supreme Court held that a *single decision by an official with policy-making authority in a given area could constitute official policy and be attributed to the government itself ...". Id.* (county prosecutor gave order that resulted in constitutional violation). Under *Monell* an "official's acts or edicts" could constitute official policy. *Monell*, supra, 436 U.S. at 694. Thus, a government's authorized decision maker adopts a particular course of action, the government may be responsible for that

policy "whether that action is to be taken only once or to be taken repeatedly." *Pembaur*, 475 U.S. at 481. Policy-making authority may be bestowed by legislative enactment or delegated by an official possessing such authority under state law. *Id.* at 483.

The Espanola Police Department Directives Manual ("EPD Directives") is the official "policy" of the Espanola Police Department. [Exhibit C, pg.1, § 1.1 – Policy]. The Chief of Police is responsible for the goals and objectives of the police department which is required distribution to "*all personnel* for inclusion in the Directives Manual." [*Id.* §§ 1.1.04 and 1.1.05]. As noted on the face page of the EPD Directives, the Chief of Police "reviewed and approved" the policies of the Espanola Police Department. [Exhibit C, pg.1]. As the policymaker, the Chief of Police adopted a policy, custom and practices which mere the moving force and cause of a violation of Plaintiffs' constitutional rights.

### 2. City's *De Facto* Policy, Practice and Custom of Disregarding Background Investigations, Not Conducting Background Investigations Or Performance Evaluations Was A Deliberate And Conscious Choice In The Face Of The Known Risk That Officers Would Violate Plaintiffs' Constitutional Rights

The City of Espanola's Personnel Policy - 3.2.2 – Outside Hiring requires all "prospective" employees to undergo background checks. [Exhibit B, § 3.2.2 (G)]. The policy requires: "*All prospective Employees must complete a background check authorization form in order to enable the City to conduct the necessary background check including a criminal background check.*" **<u>Employment by the City will be conditioned on a successful background check</u>.**" [*Id.*]. All offers of employment by the City of Espanola are conditioned upon the prospective employee's successfully completion of a background check. *Id.*

The City of Espanola also has the EPD Directives. [Exhibit C]. The EPD Directives are the policies for "…normal day-to-day operations of the Espanola Police Department." *Id.*

[Exhibit C, pg.2]. All members of the Espanola Police Department are issued a "personal copy" of the EPD Directives. [Exhibit C, pg.2].

Regarding lateral and entry level employees into the Espanola Police Department the EPD Directives sets forth the City's Policy under Title 12. [Exhibit C]. The policy is based upon, amongst other things, the "City of Espanola Personnel Rules and Regulations …". [*Id.* Policy] Pursuant to Title 12, § 12.1.04, it is the Espanola Police Department's "primary responsibility" for the "background investigations (BGI), oral interviews and *probationary period assessments.*" The Training and Recruitment Office for the Espanola Police Department is responsible for the successful completion of the selection process. [Exhibit C, § 12.1.03]. It is the "Chief of Police who has "final responsibility for the selection of personnel." [Exhibit C, § 12.1.05].

The Defendant City of Espanola through its' policymakers have informally adopted a policy, practice and/or custom of refusing to follow the City's Personnel Policies and the EPD Directives. The Defendant City of Espanola had actual or constructive notice that its action or failure to act, in this instance, was substantially certain to result in Police Officers committing constitutional violations. Yet despite this knowledge, the Defendant City of Espanola in deliberate indifference to the rights of the citizens of Espanola, including the Plaintiffs hired unqualified Officers and adopted a policy of not conducting performance evaluations as required under the City Personnel Policy and EPD Directives.

Officer Jeremy Apodaca (hereinafter "Apodaca") applied to the Espanola Police Department for employment as a ("Lateral")[2] Police Officer in December 2007. [Exhibit D, Employment Application]. Apodaca advised the Espanola Police Department that he had been

---

[2] Under the EPD Directives, § 13.1 – Lateral Entry, are required to complete, amongst other things, a (3) polygraph; (4) Psychological evaluations; and (6) Drug screening.

terminated from the Santa Fe Police Department for violating their sick leave policy. [Exhibit E, Apodaca Deposition, pg.11, lns.2-11]. In fact, despite Apodaca's failed memory, the Santa Fe Police Department's **written** termination letter included: (1) excessive sick leave; (2) insubordination; (3) not reporting for duty; and (4) failing to show up for work with a vehicle. [Exhibit F]. Apodaca failed to disclose, in his deposition the he was disciplined and terminated for (2) *insubordination*; (3) *not reporting for duty*; and (4) *failing to show up for work with a vehicle.* [*Id.* pg.16, lns.11-15].

On Apodaca's employment application with the City of Espanola, he was asked if the City could make inquiries of his "current and past supervisors or employers regarding your character". Apodaca checked the box "NO", and misleadingly wrote: "Employer # 2 (Santa Fe Police Department) due to my reason for leaving, I feel I cannot get a fair reference from them." [Exhibit D, pg.3, ¶ 1]. In fact, Apodaca intentionally omitted his reasons for leaving the Santa Fe Police Department and never disclosed that he had been disciplined and his employment had been terminated. The City's employee application provides that, acts of "omission" may be sufficient cause for rejection of the application. [Exhibit D, pg.4, PLEASE READ BEFORE SIGNING].

The City initially sent a letter to Apodaca declining to hire him. [Exhibit E, pg.16, lns.23-25]. Despite having failed the background investigation the City of Espanola hired Apodaca without doing a polygraph, psychological evaluation or drug screening. The City knew or should have known that Apodaca would violate the constitutional rights of the citizens of Española and the City elected to act deliberately indifferent to rights of its citizens. After the City hired Apodaca, contrary to the City's policies, no performance evaluations were ever conducted for Apodaca, during his probation period and during his employment career with the City. This was

so despite the Defendant Chief Joe Martinez knowledge of the EPD Policy. [Exhibit L, Joe Martinez depo., pg.70, lns.5-16][3]

Defendant Officer Robert Vigil (hereinafter "Vigil") applied to the Espanola Police Department for employment as a Police Officer in March 17, 2008. [The Exhibit O, pgs.1 and 4]. Officer Vigil, as a part of the application process, was required to sign an Espanola City Police Department – Background History/Records–Release of Liability Acknowledgement of Confidentiality Form. [Exhibit G; and Exhibit M, Stephanie Martinez depo, pg.58, lns.1-12]. The Form requires that Officer Vigil acknowledge that, "The department needs to thoroughly investigate my employment background and personnel history to evaluate my qualifications to hold the position for which I have applied. *It is in the public's interest that all relevant information concerning my personal and employment history be disclosed to the Espanola Police Department.*" [Exhibit G].

The Defendant City of Espanola never conducted a background check in which it contacted Vigil's current or previous employers, including prior police departments, or contacted educations institutions. [Exhibit M, pg.57, lns.7-25]. As the Human Resources Analyst testified, if the City does a background check or history, the documents that are received become part of the employee files. [Exhibit M, pg.59, lns.2-9]. Unlike the background investigation done for Apodaca there are no documents or documentation showing that the City contacted Vigil's current or prior employers. Further the information from the Cuba Police Department is not in Vigil's file which is further evidence of the fact that no background check of Vigil was performed by the City of Espanola.

Prior to his employment with the Espanola Police Department Vigil had the following:

---

[3] The depositions used as Exhibits in this Motion are not confidential and were not "marked" confidential by any of the parties in the *Gallegos* matter.

- Arrested in 1991 for DWI and in 2003 for Battery.

[See, Exhibit I, Answer to Interrogatory No. 13; and Exhibit N, Vigil depo., pg.25, lns.16-24] Vigil did not disclose in his application for employment with the City of Espanola that he had been arrested for Battery on a Household Member. [Exhibit O, Vigil Application, pg.5, # 11]. The EPD Directives provide that any "[m]isdemeanor criminal activity including Domestic Violence or *Battery Upon a Household Member* "… discovered during the course of the background investigation may be an automatic disqualifier." [Exhibit C, Criminal Activity, § 12.1.72].

When Vigil was employed with the Cuba Police Department the following incidents and discipline were documented by the Cuba Chief of Police:

- On February 1, 2007, Chief Jason Griego issued a Memo for "Noncompliance regarding Mandatory Vehicle Maintenance" to Officer Vigil. The Chief revoked Officer Vigil's privilege to use the police unit in commuting to and from work.

[See, Exhibit H, pg.11].

- On May 25, 2007, Chief Griego deducted eight (8) hours of compensation time from Officer Vigil's pay for an incident involving Juanita Perez and Officer Vigil's failure to verify information which occurred on May 21, 2007. It was noted that Officer Vigil was very unprofessional.

[See, Exhibit H, pg.10].

- Chief Griego on July 23, 2007, completed his investigation into the Julio Marks and Denise Montoya Complaints. Officer Vigil admitted to the conduct and was docked four (4) hours of "comp time". That same day Chief Jason Griego wrote a letter of apology to Julio Marks.

[See, Exhibit H, respectively, pgs.9 and 4].

- On July 18, 2007, Julio D. Marks filed a Citizen's Complaint against Officer Vigil for pulling up to Mr. Marks' work and "talking shit" and saying "… if I wanted anything with him to wait till he got off of work and he would accommodate me in anyway …".

[See, Exhibit H, pgs.7-8].

- On July 18, 2007, Denise Montoya filed a Citizen's Complaint against Officer Vigil for threats he made to Julio Marks. Ms. Montoya also stated that when she went to the Police Station, Officer Vigil, while in full uniform told her that "… he would fight him (Julio) if he was not on duty."

[See, Exhibit H, pgs.5-6].

- On February 22, 2008, Chief Griego demoted Captain Vigil and removed him from being a supervisor. The decision was based upon "deficiencies in both communication and people skills". There were also numerous complaints regarding Officer Vigil's communication skills from people in the department. It was also noted that Office Vigil was having problems in his personal life. Finally, Officer Vigil was disciplined for informing another Officer's wife that he was going to terminate her husband.

[See, Exhibit H, pg.3].

- February 24, 2008, Officer Vigil's privilege of driving the police unit back and forth to work was suspended for a second time.

[See, Exhibit H, pg.2].

- July 9, 2008, Officer Vigil was issued a Letter of Reprimand for failing to complete assigned tasks. Officer Vigil, on numerous occasions, was given tasks by Chief Griego and he failed to complete the tasks. Officer Vigil failed to arrange for and attend an Incident Command Course for himself and another Officer. Officer Vigil failed to attend and complete a Firearm Instruction Course. In January, Officer Vigil failed to follow several destruction orders. Officer Vigil was asked six (6) times, by Chief Griego, for a letter regarding an incident that occurred on Highway 126, with James Sanchez. When requested to research and gather information on ATV safety, Officer Vigil failed to complete the task. It was noted that Officer Vigil had a "possible attitude problem".

[See, Exhibit H, pgs.1].

Despite the City's Personnel Policies and the EPD Directives, Vigil was hired by the City of Espanola as a Police Officer. The Defendant City of Espanola had actual or constructive notice that its action or failure to act, in this instance, was certain to result in Vigil committing constitutional violations. The City knew or should have known that Vigil would violate the constitutional rights of the citizens of Española and the City elected to act deliberately indifferent

to rights of its citizens. Further, Contrary to the City's policies, no performance evaluations were ever conducted for Vigil, at the end of his probation and during his employment career.

The *de-facto* policy is evidence of negligent hiring, supervision and retention of unqualified police officers. Studies, in the area of Law Enforcement, show that the existence of a criminal history may be the single most critical indicator of a police candidate's propensity towards dishonesty and violence.[4]

> 3. **The City had a *De Facto* Policy, Practice and Custom followed by the policy makers of not conducting Internal Affairs Investigations which was a moving force behind the violations of Plaintiffs' constitutional rights**

As police departments have found, the vast majority of police recruits come directly from civilian life; thus, they do not have a civilian complaint record that can be explored. Once a police officer is allowed to treat citizens in an abusive and improper manner and that behavior goes unabated, it is commonly recognized that the pattern of abuse will continue. In most cases it will escalate. With this knowledge, police departments have established written Internal Affairs Policies and Investigation Procedures for their Internal Affairs Units (hereinafter "IAU").

The City of Espanola has an established IAU pursuant to the EPD Directives - § 26.1 et seq. The stated "Purpose" of the IAU is to provide the *Chief of Police* with a means to ensure compliance with departmental rules and regulations, to enforce internal discipline, and to provide a vehicle through which citizen concerns may be equitably evaluated and judiciously addressed. [Exhibit C, § 26.1 – Purpose]. As noted, the IAU policy sets up a "system to review and investigate complaints and allegations … *to protect the public from police misconduct*." [*Id.* Discussion]. The EDP Directives sets forth the staffing for the IAU with one sergeant or lieutenant who reports directly to the Chief of Police and *is responsible for its management and*

---

[4] The City of New York Commission to Combat Police Corruption, "Performance Study: A Review Of The New York Police Department's Background Investigation Process For The Hiring Of Police Officers," January 1999, p. 50.

*operation.*" [*Id.,* § 26.1.01]. The IAU must perform its duties in accordance with department policies and all applicable laws including "recording, registering, and controlling all alleged or suspected misconduct complaints …". [*Id.* § 26.1.02 (A)]. In addition, the IAU must supervise and control the investigation of alleged or suspected misconduct. [*Id.* § 26.1.02 (B)].

The procedures for the IAU include: (1) IAU Officer is delegated authority to investigate all allegations of misconduct including v*iolations of department or City policy, procedures, rule, regulations.* [*Id.* § 26.1.04 (A)]; (2) All formal complaints investigated by the IAU will be brought to the attention of the Chief of Police, <u>*via memorandum*</u>, within one (1) working day of the receipt of the complaint [*Id.* § 26.1.05 (D)](Italics ours); (3) **All complaints … will be recorded and investigated"** [*Id.* § 26.1.07 (C)]; and (3) upon conclusion of the investigation the employee shall be advised in writing and classified as "Sustained", "Not Sustained", "Unfounded", "Exonerated". [*Id.* § 26.1.15 (A)(1) through (A)(4)]

On May 24, 2010, Plaintiffs, Tony Rapatz, Alice Guerra, and Katherine Guerra, in the instant case, filed a Torts Claim Notice with the City of Espanola against Vigil and other officers involved in their case. [Exhibit J]. No Internal Affairs Investigation was conducted despite the Tort Claims Notice being a formal complaint as defined by the EPD Directives for Internal Affairs Investigations. [Exhibit C § 26.1.07 et. Seq.]; On May 13, 2013, Vigil, answered interrogatories, in the *Gallegos* case and concerning "whether he had been the subject of civilian complaints or internal disciplinary proceedings having to do with alleged abuse of his powers as a law enforcement officer. [Exhibit I, Interrogatory No.7] It is clear from Vigil's answers that no IAU investigation had been conducted regarding the Torts Claim Notice in *Gallegos* case and no IAU investigation conducted in the instant case despite the Plaintiffs' Torts Claim Notice and

verbal complaint to the Defendant Chief Martinez. [Exhibit K, Chief Martinez Supplemental Report of July 31, 2010 incident]

In regards to the July 31, 2010, incident which is the gravamen of the instant case, Defendant Chief Martinez conducted a "supplemental" investigation because Antonio Gallegos and Kristian Pettine "felt that they were *unjustly arrested*." [*Id.*]. The Plaintiffs' claims were sufficient enough under the EPD Directives to call for an IAU investigation. [Exhibit C, § 26.1.04] However, rather than follow the EPD Directives concerning IAU investigations, Defendant Joe Martinez conducted a "supplemental investigation" which was not done in accordance with the IAU Directives. At his deposition, Defendant Chief Joe Martinez testified that there was a "written policy" and "standard operating guide" on Espanola internal affairs investigations. [Exhibit L, Joe Martinez depo., pg.58, lns.6-15]. The IAU policy would assign the IAU investigation to the next in the chain of command. [*Id.* pg.57, lns.16-25] Defendant Chief of Police Joe Martinez, knowingly and deliberately ignored the EPD Directives involving IAU investigations. This deliberate and knowingly made policy decision by the Espanola Police Department's policymaker was the moving force and/or cause of Plaintiffs' constitutional violations.

4. **Officers demonstrated clear need for training and the City's deliberate indifference and knowing and intentional refusal to train officers was a moving force and cause of Plaintiffs' constitutional rights being violated**

Under the City's Personnel Policy – 3.3 Probationary Period for New Hires, "(A) All newly hired Employees … enter a probationary period, which is considered an integral part of the selection and evaluation process." Each new employee "is required to demonstrate suitability for the position through actual work performance. [Exhibit B, § 3.3]. At the end of the probationary period "*the Supervisor shall prepare a written performance evaluation*, which will

be reviewed by the Human Resources Director." [*Id.* § 3.3(C)]. One consideration in the City's Personnel Policy for promotions includes "performance evaluations". [*Id.* § 3.4(A)]. One of the expressly stated purposes of employee "performance evaluations" is to "*determine whether the Employee is providing satisfactory service* in the new position. *As a matter of good management, these evaluations should be communicated to the Employee to allow opportunity for improved performance.*" [*Id.* § 3.4.1].

Performance Evaluations are conducted for the purpose of the City achieving it's goal to "*train, promote and retain the best-qualified Employee for every job, the City will conduct performance evaluations for all positions at least annually.*" [Exhibit B, § 5.1(A)]. The Human Resources Director is responsible for developing and maintaining the City's performance evaluation program." [*Id.* § 5.1(B)]. Probationary Employees are evaluated by their Supervisors *prior to completion of their probationary period and on their anniversary date of promotion to regular status annually thereafter.*" [*Id.* § 5.1(C)]. The evaluations are a part of the Employee's personnel record and may be a factor in determining, amongst other things, wage increase, promotions, transfers, demotions, layoffs or termination. [*Id.* § 5.1(D)].

Defendant Chief Martinez performed a "supplemental investigation", yet he found no violations of the EPD Directives. The Defendant Chief Martinez expressly and tacitly condoned the violations admitted by the officers, including the instant Defendant Robert Vigil. Apodaca admitted to violating the EPD Directives concerning the making and documenting uses of force and use of less than lethal weapons such as a Taser. It is clear from Apodaca's testimony that he is lacking specific training in the following areas: (1) Use of Force - § 23.1.07 – "Department personnel shall <u>*strictly adhere to the department's use of force policy*</u> …" [Exhibit C, § 23.1.07] The Use of Force Policy - § 72.1 requires that the *Officer utilizing force,* which expressly

includes *empty handed application of force* [*Id.* § 72.1.08 (A)(1)(b)] or non-deadly force [*Id.* § 72.1 – Definitions, last page], must Notify the on duty supervisor and complete an Offense Incident Report. A separate "use of force incident form" must also be completed by the On-Duty supervisor. [*Id.* § 72.1.08]. In situations where use of force is used, medical documentation must be obtained, even if the subject refuses medical treatment. Additionally, photographs must be obtained of the subjects injuries. [*Id.* § 72.1.15 et seq.]

Officer Apodaca testified that he is not aware of the requirements set forth in the EPD Directives governing the use of force. [Exhibit E, pgs.35-6, lns.21-9]. Apodaca also testified that he was not aware that the Taser Policy - § 73.1.30, which required that he photograph the person's affected area as soon as possible whenever the person is Tasered. [Exhibit E, pg.85, lns.9-21]. Nor did Apodaca submit a "use of force" form as required under the Taser policy. [Exhibit E, pg.87, lns.7-17] As well, Apodaca testified that his supervisor did not question his failure to take photographs as required under the Taser policy when his incident report was reviewed. [Exhibit E, pg.86, lns. 22-25]. Apodaca admitted a lack of understanding of the EPD Directives which provided that "ignorance of any provision would not be an excuse or a defense to your violation of those procedures" or that he was required to report observations of any violations of the EPD Directives. [Exhibit E, pg.91, lns.9-23].

Vigil admits, in his deposition testimony, that while he believes that there is a "use of force report form" that he has never trained on filling one out and he never in fact filled out such a form. [Exhibit N, pg.122-3, lns.22-6 and vipg.125-7, lns.19-20]. Vigil testified that he never received training on the Taser policy, § 73.1.30. [*Id.* pg.125, lns.9-18]. There was not enforcement of the EPD Directives by Defendant Chief Martinez or any supervisor for Vigil despite his admitted policy violations. [*Id.* pg.136, lns.3-24].

The Espanola Police Department established a training program including performance evaluations as a tool to determine if an officer need remedial or other more formal types of training. The policymaker for the Espanola Police Department, defendant Joe Martinez, knowingly and deliberately refused to enforce the EPD Directives which was a custom, policy and procedure which is indifferent to the needs of the citizens of the Espanola. This directly resulted in officer not being trained and/or identifying problem areas for officers who may need more specific training.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request that this Court issue an Order granting the instant Motion and allow Plaintiffs to file their Third Amended Complaint as attached hereto as Exhibit A.

**Respectfully Submitted:**

/s/ Nathaniel V. Thompkins
Nathaniel V. Thompkins
**NEW MEXICO FIRM, LLC**
103 N. St. Francis Drive, Unit A
Santa Fe, NM 87501
Phone: (505) 988-9750
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2013, a copy of the foregoing Motion
was filed electronically. Notice of this filing will be sent to the following
parties by operation of the Court's electronic filing system (or CMECF) to:

Robert L. Cole - *Attorney for the Defendants*
PO Box 50129
Albuquerque, NM 87181
Email: rlc@rcolelaw.com

/s/ Nathaniel V. Thompkins
Nathaniel V. Thompkins