```
                                                                1
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW MEXICO
 2

 3
    ANTONIO GALLEGOS, KRISTIAN PETTINE,
 4  ANDRE GALLEGOS, and K.L.P.L., a
    minor child,
 5
                    Plaintiffs,
 6
    vs.                                  No. 1:12-CV-224-LH/KBM
 7

 8  CITY OF ESPAÑOLA, a municipal corporation,
    JOE MARTINEZ, individually and in his official capacity;
 9  JEREMY APODACA, individually and in his official
    capacity; ROBERT VIGIL, individually and in his official
10  capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
    DOES 1 through 10, individually and in their official
11  capacities,

12
                    Defendants.
13

14              DEPOSITION OF ROBERT VIGIL

15              Monday, June 17, 2013
                      9:25 A.M.
16              Cumbre Court Reporting, Inc.
                    2019 Galisteo Street
17              Santa Fe, New Mexico 87505

18

19       PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this Deposition was:
20
    TAKEN BY:   NATHANIEL V. THOMPKINS
21              ATTORNEY FOR THE PLAINTIFFS

22
    REPORTED BY:   ALLISON ASH-HOYMAN
23                 NEW MEXICO CCR #18
                   CUMBRE COURT REPORTING, INC.
24                 2019 Galisteo, Suite A-1
                   Santa Fe, New Mexico 87505
25
```



Exhibit F

Page 186

1  what charges they have. Anything -- the district -- and
2  I told you it was Lieutenant Lopez, I'm sorry, the
3  district attorney is actually the one who is going to
4  have the final say-so whether yes, we can use them or
5  no, we cannot use them.
6     Q.  So if you are going to use a confidential
7  informant and he is not already in the system, you would
8  complete the form, take it to your lieutenant; is that
9  correct?
10    A.  Yes.
11    Q.  And then the lieutenant -- or maybe he would
12 assign you to take it to the district attorney's office
13 to make sure they are okay with using him?
14    A.  I necessarily wouldn't take it. I call Shelly
15 Strong on the phone, tell her this is what I have.
16    Q.  Okay.
17    A.  These are what the charges are. This is what
18 I know about it. She would look it up, discuss what we
19 are going to try to get out of him, she would either
20 give us a go-ahead or no.
21    Q.  Has the majority of the use of confidential
22 informants been in the area of purchasing drugs?
23    A.  Yes.
24    Q.  And do they maintain performance records in
25 the Española Police Department for the confidential

Page 187

1  informants?
2     A.  No.
3     Q.  Are the -- how are the confidential informants
4  compensated?
5     A.  Most of our -- most of our confidential
6  informants are compensated -- somebody would have a
7  charge, whether it be a felony charge or misdemeanor
8  charge or whatever, we would start talking, seeing if
9  they are willing to -- if they are interested in
10 working.
11       We tell them what we want. We tell them what
12 we can possibly offer them as far as give us
13 information, help us make some controlled buys, if we
14 make a successful bust we may be able to get your
15 charges dismissed or somehow get them deferred or
16 whatever.
17       If they agree to do it, then we fill out the
18 form. That was the conversation with the district
19 attorney, you know, is it possible that John Doe has a
20 charge of aggravated battery, he has never been in
21 trouble with the law, he is able to purchase X amount of
22 heroin --
23    Q.  When you say he has never been in trouble with
24 the law, you have confidential informants that have
25 never been in trouble with the law?

Page 188

1     A.  Yes.
2     Q.  Okay.
3     A.  You know, can we use them. Will you be
4  willing to dismiss this charge if we are successful in
5  the operation which we want to do? She will say yes or
6  no.
7     Q.  If the confidential informant has never been
8  in trouble with the law, how can you offer a dismissal
9  of a charge if they are never been in trouble with the
10 law?
11       MR. BASHAM: Hold on. I object to this line
12 of questioning. I know I said I reserve all objections
13 as to form only, but this has no relevancy to this case
14 whatsoever. It's an obvious --
15       MR. THOMPKINS: Wait a minute. Wait a minute.
16 Are you going to stick by the agreement --
17       MR. BASHAM: It's a fishing expedition on your
18 part --
19       MR. THOMPKINS: -- or are you going to change
20 it?
21       THE REPORTER: One at a time.
22       MR. THOMPKINS: I'm not --
23       MR. BASHAM: -- to some other case.
24       MR. THOMPKINS: I'm not going to enter into an
25 agreement with you ever again, and we will reserve our

Page 189

1  objection at the deposition and not listen to you making
2  any agreement that you won't stick by.
3        MR. BASHAM: This is a fishing expedition.
4        MR. THOMPKINS: You have the opportunity to
5  raise your objection when the deposition is used at a
6  hearing. That's what you agreed to. Now you are
7  changing the agreement.
8        We will raise our objections when you depose
9  our clients at the deposition.
10       MR. BASHAM: That's fine.
11 BY MR. THOMPKINS:
12    Q.  So you can't make a deal with someone --
13       MR. BASHAM: I object to this.
14 Don't answer.
15       MR. THOMPKINS: Are you instructing him not to
16 answer?
17       MR. BASHAM: Yes.
18 BY MR. THOMPKINS:
19    **Q.  How long were you supervised by Christian**
20 **Lopez?**
21    **A.  Christian Lopez wasn't my direct supervisor,**
22 **but for the period that I started to the period he left.**
23    **Q.  The period that you started is 2008?**
24    **A.  Yes, sir.**
25    **Q.  And when did he leave?**

Exhibit F

Page 190

1   A.   I believe in 2012. Beginning of 2012.
2   Q.   And what was the extent of his supervision?
3   How did you report to him?
4   A.   Only with the drug stuff. Other than that I
5   didn't really report to Christian Lopez, I reported to a
6   direct supervisor.
7   Q.   Wait a minute. Okay.
8        You report to Christian Lopez, you said, only
9   for the drug stuff?
10  A.   Only for when we were investigating narcotics.
11  Q.   When you were investigating a drug crime you
12  reported to Christian Lopez?
13  A.   Sir, when I was investigating -- when we had a
14  case with narcotics, such as we got a confidential
15  informant, we made a controlled buy, I would report to
16  Christian Lopez and nobody else.
17  Q.   Okay.
18  A.   Just being that it was confidential. Anything
19  I did on a regular workday, as far as patrol, I reported
20  to a direct supervisor.
21  Q.   Okay. And how often, if you were working on
22  something that involved Christian Lopez, did you have to
23  report to him? What kinds of things did you report to
24  him?
25  A.   Reported buys, amounts of buys, search

Page 191

1   warrants. Whenever we did them we reported to him. I
2   can't say it was very often. I can't tell you how much
3   I did that.
4   Q.   Well, when you say you reported search
5   warrants to him, was it -- were you required to go to
6   him and let him know you want to get a search warrant in
7   a case?
8   A.   No, I was -- I went to him and advised him
9   that I got a search warrant on a case. A lot of times I
10  went to him and advised him we are ready to get a search
11  warrant, this is what we have done, what do you think?
12  Type it up.
13  Q.   Would he review -- after you obtained a search
14  warrant would it be his job to review it?
15  A.   We talked about it, and yes.
16  Q.   Okay. And do you have -- when you get a
17  search warrant do you have to put together an operation
18  plan?
19  A.   Yes.
20  Q.   And was that your responsibility or was that
21  your supervisor's responsibility?
22  A.   Mine.
23  Q.   Okay. And when you put the plan together was
24  your supervisor involved in putting the plan together or
25  was it your sole responsibility?

Page 192

1        MR. BASHAM: Objection as to form.
2   A.   I did the plan, I got it approved by my
3   supervisor.
4   BY MR. THOMPKINS:
5   Q.   And that supervisor in this case would have
6   been Christian Lopez?
7   A.   Yes.
8   Q.   Okay. And did you ever have a plan in which
9   you included other police agencies?
10  A.   Yes.
11  Q.   And would you have that plan reviewed by
12  Christian Lopez before it was executed?
13       MR. BASHAM: Objection. Relevancy.
14       Again, this is a fishing expedition for a
15  different case. If we need to take it to the judge,
16  let's do it, but I'm instructing him not to answer this.
17  BY MR. THOMPKINS:
18  Q.   You observed -- did you observe Officer
19  Apodaca's application of the taser gun to Mr. Gallegos?
20  A.   I did not -- I knew he had drawn the taser
21  because I heard it, but I did not observe the
22  application of the taser.
23  Q.   Do you know where the taser was used on Mr.
24  Gallegos's body?
25  A.   As I testified earlier, I do not know exactly

Page 193

1   where it was used.
2   Q.   Okay. And do you know how many times the
3   taser was used on Mr. Gallegos?
4   A.   No, I don't.
5   Q.   You mentioned that Ms. Pettine may have
6   committed child abuse. Am I correct in recalling it?
7   A.   In my opinion Ms. Pettine did commit child
8   abuse.
9   Q.   And what were the facts that support your
10  belief that she committed child abuse?
11  A.   Her minor child was walking around on a
12  hundred degree day, I don't know exactly the
13  temperature, but it was a very hot day, on hot gravel,
14  without shoes, with a soiled diaper, without a shirt on.
15  And she was intoxicated and in no condition to watch
16  over her minor child.
17  Q.   And so that in your opinion satisfied the
18  elements to be able to be charged with child abuse?
19  A.   Yes.
20  Q.   And do you know what particular section of the
21  statutes that that would have come under?
22  A.   I don't recall the particular section, no.
23  Q.   Okay. But she was not charged with that, was
24  she?
25  A.   I don't know.