**LAUREN J. ROSS Plaintiff-Appellant,**
v.
**AMERICAN RED CROSS; JOHN DOE(S) Defendants-Appellees.**

No. 12-4312

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

FILED: January 27, 2014

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0070n.06

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

**Before: GIBBONS and WHITE, Circuit Judges; GREER, District Judge.**[*]

**JULIA SMITH GIBBONS, Circuit Judge.** In September 2008, Lauren Ross participated in a blood drive at an American Red Cross ("Red Cross") center in Columbus, Ohio. She alleges that the Red Cross's phlebotomist[1] improperly inserted a needle into her left arm, injuring a nerve, and failed to provide appropriate follow-up care, causing her to develop a chronic pain condition. In October 2009, Ross sued the Red Cross in state court. The Red Cross removed the action to federal court. Following a nine-day trial, a jury found that Ross failed to prove by the greater weight

Page 2

of the evidence that the Red Cross was negligent and that its negligence proximately caused Ross's alleged injury. The jury returned a verdict in favor of the Red Cross.

On appeal, Ross argues that the district court erred by: (1) failing to impose spoliation sanctions against the Red Cross; (2) disqualifying Ross's proposed expert witness, the Red Cross's former in-house counsel, and excluding his expert report and testimony; (3) denying Ross's pretrial motion to amend the complaint; (4) granting the Red Cross's motion *in limine* to exclude references to consent decrees, government agency inquiries and penalties, and other lawsuits against the Red Cross; (5) declining to give a *res ipsa loquitur* jury instruction; (6) granting the Red Cross judgment as a matter of law on Ross's negligent aftercare claim; (7) denying Ross's post-trial motion to amend the complaint; and (8) denying Ross a fair trial as a result of these errors. We affirm the district court's rulings and uphold the jury's verdict.

I.

On September 12, 2008, Ross went to a Red Cross[2] facility in Columbus, Ohio, to donate blood. Ross, who had donated blood at the Red Cross on other occasions, read the pamphlet



"What You Must Know Before Giving Blood," which outlined potential complications from blood donation, including nerve damage. She signed a consent form certifying that she had read the pamphlet.

Page 3

    Dedra Montague, the Red Cross's phlebotomist, attempted to draw blood from Ross's left arm. When Montague tried to insert the needle into Ross's vein, Ross felt "overwhelming pain" and cried out. Montague removed the needle, called her supervisor, Shelby King, and bandaged and iced Ross's arm. Ross described her symptoms, including sharp pain and muscle spasms, which the Red Cross's materials for evaluating donor complications suggested might indicate nerve irritation. The instructions for treating nerve irritation recommended bandaging the site and applying ice, which Montague had done. Montague completed a "Donor Reaction/Injury Record" ("DRIR"),[3] which is used by the Red Cross to document possible complications from a blood donation. As Montague completed the document, Ross allowed King to draw blood from her right arm. When Ross finished donating blood, Montague provided Ross with instructions for caring for herself and a phone number to call if she experienced further complications.

Page 4

    The next day, Ross called the Red Cross and said that she was still in pain. Throughout the next week, Ross communicated with Linda Stacy, a Red Cross employee, who advised her regarding proper follow-up care for nerve irritation. Ross provided Stacy with updates on her condition and medical appointments until January 2009. The Red Cross documented these communications in Ross's DRIR.

    In October 2009, Ross filed suit against the Red Cross in Ohio state court. She alleged that when Montague tried to draw her blood, she missed a vein and hit a nerve in Ross's arm, injuring the nerve and causing Ross to develop a chronic pain condition called "complex regional pain syndrome" ("CRPS").[4] Ross alleged that Montague negligently attempted to draw her blood and failed to provide proper care after her injury, thereby causing additional, permanent injury. The Red Cross removed the action to federal court.

    In July 2012, the district court held a jury trial. During the nine-day trial, Ross and Montague testified. Several expert witnesses disputed whether Ross had a nerve injury or CRPS and whether any such injury was caused by Montague's negligence. At the close of Ross's evidence, the Red Cross moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district court denied the motion with respect to Ross's claim that Montague negligently performed her blood draw, but it granted the motion with respect to Ross's claim that Montague

Page 5

negligently failed to provide proper care following Ross's injury. At the close of trial, the district court instructed the jury and submitted to it six interrogatories. The first interrogatory asked whether Ross "prove[d] by the greater weight of the evidence that [the Red Cross] was negligent



Exhibit B

and that [the Red Cross's] negligence proximately caused injury or loss to [Ross]." The remaining interrogatories concerned damages. The jury answered the first interrogatory in the negative, finding that Ross failed to demonstrate that the Red Cross was negligent and that its negligence injured Ross. The jury returned a verdict in favor of the Red Cross. Ross now appeals various rulings made by the district court before, during, and after trial.

## II.

The Red Cross invoked the district court's jurisdiction under 36 U.S.C. § 300105(a)(5), a provision in the Red Cross's charter providing that it may "sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States." 36 U.S.C. § 300105(a)(5). This provision "confers original jurisdiction on federal courts over all cases to which the Red Cross is a party, with the consequence that the organization is thereby authorized to remove from state to federal court any state-law action it is defending." *Am. Nat'l Red Cross v. S.G.,* 505 U.S. 247, 248 (1992). We have jurisdiction over the final order of the district court denying Ross's motion for a new trial pursuant to 28 U.S.C. § 1291.

## III.

### A.

First, Ross argues that the district court abused its discretion by denying her motion for spoliation sanctions against the Red Cross.

Page 6

During discovery, Ross requested the DRIR containing information related to her injury. The Red Cross produced a copy of the DRIR as it existed on September 19, 2008, which included notes from Ross's blood donation and her communications with Stacy the following week. The Red Cross did not provide a version reflecting Ross's later communications with the Red Cross.

The Red Cross explained that between September 2008 and early 2009, it transferred functions related to donor support from regional Red Cross offices to centralized Donor and Client Support Centers ("DCSCs") in Charlotte, North Carolina, and Philadelphia, Pennsylvania. The central Ohio office sent its DRIRs to Charlotte in January 2009. The Red Cross claimed that during this time "the DRIR concerning [Ross] was inadvertently misplaced," and the Red Cross could not locate it during searches of the Ohio and Charlotte offices. The copy of the DRIR that the Red Cross produced was forwarded to the Red Cross's risk manager on September 19, 2008, and was located in his files. The Red Cross claimed that it was unaware of a possible lawsuit by Ross until it received a letter from her attorney in March 2009.

Prior to trial, Ross moved for spoliation sanctions. She sought an order prohibiting the Red Cross from introducing evidence that it provided proper aftercare to Ross and an instruction allowing the jury to infer negligence by the Red Cross due to its spoliation of evidence. She also


Exhibit B

sought to amend the complaint to add a demand for punitive damages. The district court denied the motion.

We review a district court's decision not to impose spoliation sanctions for abuse of discretion, "'[g]iving great deference to the district court's credibility determinations and findings of fact.'" Adkins v. Wolever, 692 F.3d 499, 503 (6th Cir. 2012) (quoting *Beaven v. U.S. Dep't of*

Page 7

*Justice,* 622 F.3d 540, 554 (6th Cir. 2010)). A district court abuses its discretion "'when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact.'" *Id.* (quoting Jones v. Ill. Cent. R.R. Co., 617 F.3d 843, 850 (6th Cir. 2010)).

Spoliation is "the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." United States v. Copeland, 321 F.3d 582, 597 (6th Cir. 2003) . A district court has inherent power "to craft proper sanctions for spoliated evidence." Adkins v. Wolever, 554 F.3d 650, 651 (6th Cir. 2009) (en *banc*). "Because failures to produce relevant evidence fall 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality,' the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Id.* at 652-53 (quoting Welsh v. United States, 844 F.2d 1239, 1246 (6th Cir. 1988), *overruled on other grounds by Adkins,* 554 F.3d 650). A district court may "impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Id.* at 653.

An adverse inference instruction "is appropriate if the Defendants 'knew the evidence was relevant to some issue at trial and . . . [their culpable] conduct resulted in its loss or destruction.'" *Beaven,* 622 F.3d at 553 (quoting Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 450 (4th Cir. 2004)) (internal quotation marks and citation omitted).

[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were

Page 8

destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Id.* (quoting Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)) (internal quotation marks and citation omitted). "The test prescribed in *Beaven* is conjunctive; thus, so long as the district court did not err in determining that [the party seeking an adverse inference instruction] had not satisfied at least one of the prongs, its determination that a spoliation sanction was not warranted should not be upset." *Adkins,* 692 F.3d at 504.



Exhibit B

The district court held that Ross did not establish any of *Beaven's* requirements. First, it observed that the Red Cross was not notified of Ross's potential lawsuit until March 2009—at least two months after Ross's DRIR was misplaced. Second, it noted that the evidence shows "that the Red Cross [] *lost* the documents inadvertently, not that it [] destroyed them in bad faith." Thus, it concluded that the Red Cross did not have "a sufficiently 'culpable state of mind' to warrant the sanction of an adverse inference." Third, the district court stated that the missing DRIR could have been relevant to Ross's negligent aftercare claim, but that its absence did not unduly hinder Ross's case because both Ross and Stacy, who were parties to the conversations documented in the DRIR, were available to testify. Therefore, the district court declined to impose an adverse inference sanction, and, for similar reasons, it denied Ross's request to exclude evidence showing that the Red Cross provided proper follow-up care.

Ross argues that the Red Cross had an obligation to preserve the DRIR pursuant to the Consent Decree. However, the relevant question for purposes of spoliation sanctions is whether the Red Cross had an obligation to preserve the DRIR because it knew or should have known that the

Page 9

document was relevant to future litigation. *Beaven,* 622 F.3d at 553 ("An obligation to preserve may arise when a party should have known that the evidence may be relevant to future litigation, but, if there was no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case and intentional destruction.") (internal quotation marks and citations omitted); *see also Johnson v. Metro. Gov't of Nashville & Davidson Cnty.,* 502 F. App'x 523, 532 (6th Cir. 2012) ("[T]he obligation element is met where a defendant knows evidence might be relevant to future potential litigation."). Ross asserts that the Red Cross failed to maintain the DRIR "despite knowledge that [] Ross was likely to file an action against [the Red Cross]," but Ross does not point to evidence demonstrating the Red Cross's awareness of potential litigation prior to March 2009. The district court did not clearly err by crediting the Red Cross's explanation that it inadvertently lost the DRIR prior to learning of Ross's potential lawsuit. *Beaven,* 622 F.3d at 554 (observing that "the 'veracity of [defendant's] stated reasons for destroying the [evidence] is an issue of credibility,'" and appellate courts give "great deference" to district courts' credibility determinations) (quoting *Kronisch v. United States,* 150 F.3d 112, 127 (2d Cir. 1998)) (internal quotation marks omitted). Therefore, it did not abuse its discretion by concluding that Ross did not satisfy the first *Beaven* prong.

Because the district court properly concluded that the first *Beaven* prong was not met, we need not consider the second and third prongs.[5] The district court did not abuse its discretion by

Page 10

refusing to impose spoliation sanctions against the Red Cross or by denying Ross's motion to amend the complaint to add a demand for punitive damages.

**B.**



Exhibit B

Ross argues that the district court abused its discretion by disqualifying one of her proffered expert witnesses, the Red Cross's former in-house counsel, and by excluding his expert report and testimony.

During discovery, Ross disclosed her intent to call Larry Moore as an expert witness. Moore was employed by the Red Cross as deputy general counsel and interim general counsel from 2001 to 2006. During that time, Moore handled a variety of legal matters and oversaw all litigation involving the Red Cross, including donor-injury lawsuits. Moore was also the lead counsel in negotiations that culminated in the amendments to the Consent Decree. Moore signed a confidentiality agreement with the Red Cross.

Ross planned to have Moore offer his opinions that: (1) phlebotomy and venipuncture[6] should be classified as inherently dangerous activities; (2) the Red Cross's failure to maintain a log of needlestick injuries and to document Ross's injury violated the Needlestick Safety and Prevention Act of 2001 and constituted negligence *per se;* and (3) Montague's failure to properly draw Ross's blood and to provide appropriate follow-up care is evidence of the Red Cross's violation of the Consent Decree's training requirements.

Page 11

The Red Cross moved to strike Moore's written report, exclude his testimony from the record, and prohibit Moore from participating in the case. The Red Cross argued that: (1) Moore's involvement in the case violated the confidentiality agreement and jeopardized the Red Cross's privileged communications and work product protections; (2) Moore's proposed testimony consisted of inadmissible legal conclusions; and (3) Moore's proposed testimony was not relevant to Ross's negligence claim. The district court granted the Red Cross's motion to disqualify Moore and to exclude his expert report and testimony. It denied the Red Cross's motion to strike Moore's expert report from the record.

A district court's disqualification of an expert is reviewed for abuse of discretion. *Koch Ref. Co. v. Jennifer L. Boudreaux M/V,* 85 F.3d 1178, 1181 (5th Cir. 1996). We have not considered whether federal courts have inherent power to disqualify an expert, but other courts have concluded that they do. *See, e.g., Koch Ref. Co.,* 85 F.3d at 1181; *Paul By and Through Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 277-78 (S.D. Ohio 1988). "Expert disqualification may be warranted when 'a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment.'" *3D Sys., Inc. v. Envisiontec, Inc.,* No. 05-74891, 2008 WL 4449595, at *1 (E.D. Mich. Oct. 1, 2008) (quoting *Eastman Kodak Co. v. AGFA-Gevaert N.V.,* No. 02-CV-6564, 2003 WL 23101783, at *1 (W.D.N.Y. Dec. 4, 2003)).

Courts generally apply a two-step inquiry to determine whether disqualification is proper. *Sensormatic Elecs. Corp. v. WG Sec. Prods., Inc.,* No. 2:04-CV-167, 2006 WL 5111116, at *2 (E.D. Tex. Feb. 9, 2006). "First, the court asks whether the adversary had a confidential relationship with

Page 12


Exhibit B

the expert. Second, the court asks whether the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Id.*; *see also Koch Ref. Co.*, 85 F.3d at 1181 (asking whether it was "objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed" and whether "any confidential or privileged information [was] disclosed by the first party to the expert") (quoting *Mayer v. Dell,* 139 F.R.D. 1, 3 (D.D.C. 1991)). Some courts also consider policy objectives favoring disqualification, including preventing conflicts of interest and maintaining the integrity of the judicial process. *See, e.g.*, *Koch,* 85 F.3d at 1182. "The party seeking disqualification bears the burden of proving these elements." *Id.* at 1181.

The district court first noted that there is no dispute that Moore had a confidential relationship with the Red Cross. It then stated that "the evidence provided by the Red Cross provides ample support for the conclusion that Moore was entrusted with confidential information that relates directly to the matters on which he intends to provide expert testimony against the Red Cross." For example, Moore "provided privileged advice during the negotiation of the consent decree identified in his expert report—the very same consent decree he intends to opine that the Red Cross violated in this case." Additionally, Moore oversaw all litigation involving the Red Cross, including donor-injury cases, at least one of which involved nerve injury and CRPS. Finally, Moore "provided privileged advice regarding the Red Cross's compliance with FDA blood regulations." The district court observed that policy objectives favored Moore's disqualification, noting "the unseemly nature" of his participation in the case. It concluded that Moore's involvement "threatens

Page 13

the integrity of the attorney-client and attorney work product privileges and impinges upon Moore's duty of confidentiality owed to his former client."

Ross argues that the Red Cross did not demonstrate that Moore "would necessarily use or reveal confidential information" while serving as an expert witness. The district court properly rejected this argument, observing that the question "is not whether Moore will 'necessarily use or reveal' confidential information" but, rather, "whether Moore *actually obtained* confidential information from the Red Cross when it was objectively reasonable for the Red Cross to believe it had a confidential or fiduciary relationship with him." Furthermore, the district court stated that "even if the test were as Ross characterizes it, the result would not be different" because, for example, Moore sought to opine on whether the Red Cross violated the Consent Decree, which he negotiated while employed by the Red Cross.

The district court did not abuse its discretion by disqualifying Moore and by excluding his expert report and proposed testimony.[7]

**C.**

Page 14


Exhibit B

Ross argues that the district court abused its discretion by denying her pretrial motion[8] to amend the complaint to add a claim alleging that the Red Cross is strictly liable for her injuries because venipuncture and phlebotomy are inherently dangerous activities.

In December 2009, the magistrate judge issued a preliminary pretrial order establishing January 4, 2010, as the deadline to amend the pleadings. The district court also issued a scheduling order in December 2009. Ross initially was represented by Craig D. Barclay, but Barclay filed a motion to withdraw as counsel in February 2011. Shortly thereafter, Percy Squire entered his appearance as counsel for Ross.[9] When he did so, he asked the district court to make several changes to the case schedule, but he did not ask the district court to extend the deadline to amend the pleadings. The district court denied Squire's request, but later amended the case schedule following a status conference. The district court did not extend the deadline to amend the pleadings.

In July 2011, Ross moved for leave to amend the complaint to add three claims premised on strict liability, negligence *per se,* and violation of the Consent Decree.[10] The district court denied Ross's motion. It observed that Ross made her motion several months after the January 4, 2010 deadline to amend the complaint and, therefore, it construed her motion for leave to amend as a

Page 15

request to modify the case schedule to permit such a motion. It held that Ross could not demonstrate "good cause" to modify the case schedule as required by Federal Rule of Civil Procedure 16(b). Ross filed an objection to the denial of her motion for leave to amend, which was denied.

We review for abuse of discretion the district court's denial of a motion for leave to amend filed after a Rule 16(b) deadline. *Leary v. Daeschner,* 349 F.3d 888, 909 (6th Cir. 2003); *see also Marcilis v. Twp. of Redford,* 693 F.3d 589, 597 (6th Cir. 2012) ("We review a district court's denial of a motion to modify a scheduling order for abuse of discretion."). Ordinarily, a district court "should freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, when a plaintiff moves to amend the complaint after the deadline established by a scheduling order, the "'plaintiff first must show good cause under Rule 16(b) [of the Federal Rules of Civil Procedure] for failure earlier to seek leave to amend' and the district court must evaluate prejudice to the nonmoving party before 'a court will [even] consider whether amendment is proper under Rule 15(a).'" *Commerce Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (quoting *Leary,* 349 F.3d at 909); *see also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). In order to demonstrate good cause, the plaintiff must show that the original deadline could not reasonably have been met despite due diligence and that the opposing party will not suffer prejudice by virtue of the amendment. *Leary,* 349 F.3d at 906.

The district court held that Ross could not demonstrate good cause to extend the deadline to amend the complaint because Ross's proposed amendments were not based "on any newly discovered facts." A plaintiff does not establish "good cause" to modify a case schedule to extend


Exhibit B

Page 16

the deadline to amend the pleadings where she was aware of the facts underlying the proposed amendment to her pleading but failed, without explanation, to move to amend the complaint before the deadline. *See Leary,* 349 F.3d at 908 (observing that the plaintiffs did not demonstrate good cause where they offered no excuse for their delay in seeking monetary damages, but were "obviously aware of the basis of the claim for many months"); see *also Korn v. Paul Revere Life Ins. Co.,* 382 F. App'x 443, 450 (6th Cir. 2010) *(per curiam)* (concluding that the plaintiff did not demonstrate good cause where a regulatory settlement agreement was publicly available and the plaintiff was aware of the agreement, but the plaintiff, without explanation, failed to move to amend the complaint to add a claim for breach of the agreement until after the deadline); *Commerce Benefits Grp., Inc.,* 326 F. App'x at 376 (holding that the plaintiff did not demonstrate good cause where it "could not adequately explain its delay in bringing the claims [that it sought to add]" and "the factual basis for the new claims existed at the beginning of the lawsuit"); *Shane v. Bunzl Distribution USA, Inc.,* 275 F. App'x 535, 537 (6th Cir. 2008) (holding that the plaintiff did not demonstrate good cause where he knew of the facts underlying his motion to amend the complaint for "at least six years prior to his motion" and could have pled the allegations he sought to add within the parameters of the court's scheduling order).

Ross argues that she meets Rule 15(a)'s requirements for amending the complaint. However, she does not address whether she demonstrates "good cause" to amend the case schedule, as required by Rule 16(b). Ross suggests that her failure to comply with the scheduling order should be excused because she obtained new counsel more than a year after the deadline to amend the pleadings. However, the substitution of new counsel does not justify failure to comply with a scheduling order.

Page 17

*See Leza v. City of Laredo,* 496 F. App'x 375, 377 (5th Cir. 2012) *(per curiam)* (holding that the district court did not abuse its discretion by denying the plaintiff's motion to amend the scheduling order to reopen discovery where the plaintiff "made no showing that his former attorney provided poor representation that negatively impacted his discovery"); *Hussain v. Nicholson,* 435 F.3d 359, 364 (D.C. Cir. 2006) (holding that the district court did not abuse its discretion by denying the plaintiff's motion to amend the scheduling order to reopen discovery even where the plaintiff's former attorney failed to conduct any discovery during the allotted time frame because "a party who voluntarily chooses his attorney 'cannot . . . avoid the consequences of the acts or omissions of this freely selected agent'") (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 633-34 (1962)).

Ross does not demonstrate that, with due diligence, she could not have reasonably met the original deadline. Additionally, the Red Cross argues that it would have suffered prejudice if the case scheduled were modified to allow Ross to add new claims because it would have had only one month to depose Ross's expert witnesses and two months to identify its own expert witnesses after the addition of new claims. In light of these considerations, the district court did not abuse its discretion by holding that Ross did not demonstrate "good cause" for modifying the case



Exhibit B

schedule and, therefore, that she was not entitled to amend her pleadings after the deadline set by the court.

### D.

Ross argues that the district court abused its discretion by granting the Red Cross's pretrial motion *in limine* to exclude evidence and argument relating to: (1) settlements, consent decrees, or judgments involving the Red Cross, specifically, the Consent Decree between the Red Cross and the United States; (2) governmental agency inquiries, investigations, correspondence, fines, or penalties

Page 18

involving the Red Cross, specifically, any "adverse determination letters" ("ADLs") issued to the Red Cross by the FDA; and (3) other lawsuits filed against the Red Cross. The district court excluded the evidence pursuant to Federal Rules of Evidence 402 and 403, holding that it was irrelevant and prejudicial.

We review a district court's grant of a motion *in limine* for abuse of discretion. *United States v. Humphrey,* 608 F.3d 955, 957 (6th Cir. 2010). Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence to determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Additionally, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The district court considered each category of materials identified in the Red Cross's motion. First, it observed that evidence of the Consent Decree is irrelevant because it "does not inform the key issue of whether the Red Cross was negligent in attempting to draw [Ross's] blood on September 12, 2008, or in its 'aftercare' following needlestick injury." The district court noted that "[e]ven if the Consent Decree has relevance as evidentiary background, its probative value is substantially outweighed by the risks of unfair prejudice and confusion." For example, introducing evidence of the Consent Decree could "lead the jury to believe that [Ross's] claims derive from the Decree itself" and force the parties "to explain and relitigate old issues that have, at best, only minimal relevance to the present case."

Page 19

Similarly, the district court concluded that ADLs that the FDA issued to the Red Cross for violating the Consent Decree and other provisions that do not involve Ross or her September 2008 donation are irrelevant. It observed that Ross sought to use the ADLs to demonstrate that the Red Cross must have violated the rules in Ross's case because it did so in other cases. The district court held that even if this information were probative of a fact at issue in Ross's case, its probative value is substantially outweighed by the risk of unfair prejudice because "[t]here is a substantial risk that the jury, looking at the Red Cross's unrelated violations in other regions and



Exhibit B

at other times, would draw an improper conclusion regarding the Red Cross's conduct in this case."

Finally, the district court held that the evidence of other lawsuits involving the Red Cross is inadmissible. Ross argued that she intended to use the lawsuits as evidence of "foreseeability and proximate causation." The district court reasoned that "[t]here is no dispute that the Red Cross owed [Ross] a duty of care, rendering foreseeability of [Ross's] injury a collateral issue, at best." Moreover, it noted that "[Ross] fails to explain how another lawsuit informs the issue of whether the needle stick proximately caused the onset of [Ross's] CRPS/RSD [reflex sympathetic dystrophy] in *this* case." Finally, the district court concluded that any probative value is substantially outweighed "by the risk that the jury will draw improper conclusions from other incidents in which the Red Cross's actions allegedly caused injuries."

Ross argues that evidence of the Consent Decree was necessary to explain why the Red Cross adopted the policies regarding donor records that it allegedly violated in this case and what its duties were pursuant to those policies. However, the district court did not abuse its discretion by concluding that even if evidence of the Consent Decree would have provided relevant background

Page 20

information, its probative value was substantially outweighed by the risk of prejudice. *See Gribben v. United Parcel Serv., Inc.,* 528 F.3d 1166, 1172 (9th Cir. 2008) (holding that the district court did not abuse its discretion by refusing to admit evidence of a prior consent decree because "it was irrelevant and would have been unduly prejudicial, confusing, and misleading").

Ross also contends that evidence of other lawsuits was necessary to establish foreseeability and proximate cause, especially "because many jurors might otherwise not believe that such grave injuries as [] Ross suffered could not result or be expected to result from a mere needlestick." The district court did not abuse its discretion by concluding that any probative value of this evidence was substantially outweighed by the danger of unfair prejudice. *See McLeod v. Parsons Corp.,* 73 F. App'x 846, 854 (6th Cir. 2003) (holding that the district court did not abuse its discretion by excluding evidence of other employment discrimination lawsuits filed against the defendant because "there was no clear nexus between these lawsuits and this case" and "the potential for prejudice that would have accompanied this evidence would have substantially outweighed its probative value").

Finally, Ross asserts in her reply brief that a January 13, 2012 ADL was relevant because it concerned DRIR maintenance and retention problems at the repository where Ross's DRIR was stored. Ross makes this argument for the first time in her reply brief, and, therefore, we do not consider it. *Sanborn v. Parker,* 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held . . . that arguments made to us for the first time in a reply brief are waived.").

For these reasons, the district court did not abuse its discretion by granting the Red Cross's motion *in limine*.



Exhibit B

**E.**

Page 21

Ross argues that the district court abused its discretion by failing to give the jury a *res ipsa loquitur* instruction. Ross moved for a *res ipsa loquitur* instruction several months prior to trial, and the district court denied the motion for the reasons stated in its order addressing the Red Cross's motion for summary judgment, which observed that the doctrine of *res ipsa loquitur* is inapplicable to Ross's case. Ross proposed the instruction again at the end of trial, and the district court denied her request summarily, again finding it inapplicable.

"We review for abuse of discretion a district court's refusal to give [a] requested jury instruction[]." *Williams v. Eau Claire Pub. Sch.,* 397 F.3d 441, 445 (6th Cir. 2005). "We will reverse a judgment based on inadequate jury instructions only 'if the instructions, viewed as a whole, were confusing, misleading and prejudicial.'" *Id.* (quoting *Kitchen v. Chippewa Valley Sch.,* 825 F.2d 1004, 1011 (6th Cir. 1987)).

"Generally speaking, to prove negligence a plaintiff must identify specific actions or omissions by the defendant and 'must point to a particular way in which that conduct could have been made safer.'" *Freudeman v. Landing of Canton,* 702 F.3d 318, 325 (6th Cir. 2012) (quoting Dan B. Dobbs *et al., Dobbs' Law of Torts* § 168 (2d ed. 2012)). "If the plaintiff cannot point to specific actions, he or she can sometimes invoke the doctrine of res ipsa loquitur." *Id.* "Res ipsa loquitur is an evidentiary rule that permits, but does not require, a jury to draw an inference of negligence from circumstantial evidence." *Estate of Hall v. Akron Gen.Med. Ctr.,* 927 N.E.2d 1112, 1115 (Ohio 2010). *Res ipsa loquitur,* literally translated, means "the thing speaks for itself." *Id.* at 1116.

Page 22

In order for *res ipsa loquitur* to apply, the plaintiff must establish "'(1) [t]hat the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.'" *Id.* at 1118 (quoting *Hake v. George Wiedemann Brewing Co.,* 262 N.E.2d 703, 705 (Ohio 1970)). Where the evidence shows

that there are two equally efficient and probable causes of the injury, one of which is not attributable to the negligence of the defendant, the rule of res ipsa loquitur does not apply. In other words, where the trier of the facts could not reasonably find one of the probable causes more likely than the other, the instruction on the inference of negligence may not be given.

*Jennings Buick, Inc. v. City of Cincinnati,* 406 N.E.2d 1385, 1389 (Ohio 1980).

The expert proof at trial was conflicting as to whether Ross in fact sustained a nerve injury or CRPS, whether Montague was negligent, and whether any injury to Ross was caused by Montague's negligence. The expert testimony most pertinent to the *res ipsa* issue was that of



Linda Chalmers, Robert Knobler, and David Woodruff. Chalmers, defendant's expert, said that nerve injury can occur even when a phlebotomy is properly performed, and plaintiff's expert, Knobler, said that a needlestick can cause CRPS or RSD in the absence of negligence. On the other hand, plaintiff's expert Woodruff testified that a nerve injury can only occur during intravenous needle placement if the needle is placed improperly.

The expert testimony then clearly created jury issues as to whether Montague was negligent and whether any injury to Ross was caused by negligence or was simply a result of a needlestick that occurred in the absence of negligence. What is missing in this record is a sufficient showing that

Page 23

"in the ordinary course of events" such an injury would not have occurred in the absence of negligence, a requirement for the application of *res ipsa loquitur.*

The *res ipsa* doctrine permits an inference of negligence to be drawn in situations that are hardly analogous to that presented here. The classic *res ipsa* case involves a sponge or surgical instrument left in the body during a surgical procedure. *See, e.g.*, Ault v. Hall, 164 N.E. 518 (Ohio 1928) (sponge left in abdomen); Bradshaw v. Wilson, 94 N.E.2d 706 (Ohio Ct. App. 1950) (bone fragment left in fracture site). Other cases involve situations in which there was no doubt that "in the ordinary course of events" the injury that occurred would not have happened in the absence of negligence. *See, e.g.,* Hake v. George Wiedemann Brewing Co., 262 N.E.2d 703 (Ohio 1970) (applying *res ipsa* where a beer keg, exclusively controlled by the defendant, rolled off a second story stairway platform and struck the plaintiff, who was walking underneath); Worland v. Rothstein, 49 N.E.2d 165 (Ohio 1943) (applying *res ipsa* where a wet sponge fell and struck plaintiff, who looked up to see defendant window washer with his bucket overturned); Hiell v. Golco Oil Co., 28 N.E.2d 561 (Ohio 1940) (applying *res ipsa* where customers at a gas station were injured in an unexplained explosion that occurred when defendant company's agents were blending gasoline); *see also* Neal v. Wilmoth, 342 S.W.2d 701 (Ky. Ct. App. 1961) (applying *res ipsa* where dentist's drill slipped off patient's tooth and drilled deeply into plaintiff's tongue).

The evidence that comes closest to that required for a *res ipsa* instruction is Woodruff's testimony. Yet *Jennings Buick* makes clear that this sort of testimony, when coupled with evidence that it is equally probable that Ross's injury was not attributable to negligence, is not sufficient to warrant a *res ipsa* instruction.

Page 24

The district court did not abuse its discretion in denying Ross's request for a *res ipsa loquitur* instruction.

F.



# Exhibit B

Ross argues that the district court erred by granting the Red Cross's motion for judgment as a matter of law on Ross's negligent aftercare claim.

At the close of Ross's evidence, the Red Cross moved for judgment as a matter of law on Ross's claims pursuant to Federal Rule of Civil Procedure 50(a). With respect to Ross's negligent aftercare claim, the Red Cross argued that Ross presented no expert testimony indicating that the Red Cross deviated from the standard of care with respect to the follow-up care it provided Ross. It noted that the district court prohibited Knobler from testifying with respect to this claim and that Woodruff did not address the claim in his testimony. Ross contended that no expert testimony was required on this point. The district court granted the motion on Ross's negligent aftercare claim.

"We review *de novo* a district court's decision to grant judgment as a matter of law under Rule 50(a)." *Diamond v. Howd,* 288 F.3d 932, 935 (6th Cir. 2002). Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *see also Lowery v. Jefferson Cnty. Bd. of Educ.,* 586 F.3d 427, 432 (6th Cir. 2009) (observing that "[a] court may grant judgment as a matter of law 'only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party'") (quoting *Pouillon v. City of Owosso,* 206 F.3d 711, 719 (6th Cir. 2000)). In reviewing the district court's decision, "[w]e consider all the evidence in the record, including

Page 25

those facts that are in dispute, in the light most favorable to the nonmoving party, giving her the benefit of all reasonable inferences." *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 867 (6th Cir. 2001). We do not make credibility determinations or weigh the evidence. *Id.*

In granting the Red Cross's motion, the district court observed that in a prior order it had "specifically stated . . . that expert testimony or some type of testimony would be needed to explain the standard of care necessary on an aftercare claim." In the order, the district court explained that "[Ross's] negligent aftercare claim does not allege a claim of ordinary negligence that would be within the knowledge of a lay juror." Rather, Ross "claims that negligent aftercare either caused or exacerbated her condition." The district court stated that "[i]f [Ross] is seeking to link the Red Cross's allegedly negligent aftercare to the onset or worsening of her CRPS/RSD condition, such a theory requires expert testimony to assist the jury, at least with regard to the issue of causation" because "it takes specialized knowledge to make a valid factual determination of whether certain factors contributed to the onset or exacerbation of a complex medical condition like CRPS/RSD." In the course of ruling on the Red Cross's Rule 50(a) motion, the district court observed that no testimony "lay or otherwise" was offered at trial with respect to the standard for aftercare.

Ross does not point to evidence presented at trial that supports her negligent aftercare claim. She does not identify evidence indicating what the appropriate standard is for follow-up care, how the Red Cross failed to meet it, or how this led her to develop CRPS. Ross suggests in her



reply brief that if the district court had not excluded evidence of the Consent Decree or ADLs, she would have been able to offer such proof. However, the district court did not abuse its discretion by excluding this evidence, and Ross does not demonstrate that it was relevant to her negligent aftercare

Page 26

claim. Ross also argues in her reply brief that expert testimony is not required to support a negligent aftercare claim. However, the district court noted that in Ross's case, the issue was not one of ordinary negligence. Rather, the question was whether the follow-up care provided by the Red Cross caused or exacerbated Ross's CRPS. The district court correctly concluded that expert testimony was necessary to explain how the Red Cross's actions contributed to Ross's condition.

The Red Cross notes that the theory underlying Ross's negligent aftercare claim has shifted. On appeal, Ross contends that the Red Cross "falsely promised" to provide medical care to donors who suffered complications and that the jury should have been permitted to consider "a fraudulent representation claim." Ross did not raise this theory before or during trial. She raised this theory in a post-trial motion to amend the complaint and motion for a new trial, but she does not appeal this aspect of the district court's denial of the post-trial motion. Therefore, we decline to address this theory.

For these reasons, the district court properly granted the Red Cross judgment as a matter of law on Ross's negligent aftercare claim.

### G.

Ross argues that the district court abused its discretion by denying her post-trial motion to amend the complaint to add a strict liability claim based on inherently dangerous activities and failure to warn.[11]

Page 27

After the jury returned a verdict in favor of the Red Cross, Ross filed a post-trial motion pursuant to Federal Rule of Civil Procedure 15(b) to amend the complaint to include claims that Ross argued the Red Cross impliedly consented to try. Ross sought to amend the complaint to address four issues: (1) the Red Cross's strict liability for injury "caused by a dangerous risk inherent to venipuncture . . . that was undisclosed to her;" (2) the Red Cross's failure to adequately warn Ross about the connection between venipuncture and CRPS; (3) whether the doctrine of *res ipsa loquitur* applied; and (4) whether the Red Cross "intentionally and/or fraudulently represented that it would provide medical aftercare for venipuncture complications."[12] Ross also argued that she was entitled to a new trial to decide these issues. The district court denied the motion.

We review a decision to deny a Rule 15(b) motion to amend for abuse of discretion. *Kovacevich v. Kent State Univ.,* 224 F.3d 806, 831 (6th Cir. 2000).



Exhibit B

Rule 15(b) provides, in relevant part:

When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.

Rule 15(b) "is designed to allow parties to a civil action to get to the heart of the matter and not have relevant issues obscured by pleading niceties. It was not designed to allow parties to change theories in mid-stream." *Donald v. Wilson,* 847 F.2d 1191, 1198 (6th Cir. 1988). In order for a court to find implied consent to try a claim, there must be "considerable litigation of a matter."

Page 28

*Kovacevich,* 224 F.3d at 831. Implied consent "is not established merely because one party introduced evidence relevant to an unpleaded issue and the opposing party failed to object to its introduction. It must appear that the parties understood the evidence to be aimed at the unpleaded issue." *Yellow Freight Sys., Inc. v. Martin,* 954 F.2d 353, 358 (6th Cir. 1992). Evidence "that is relevant to a pleaded issue as well as an unpleaded issue cannot serve to give the opposing party fair notice that the new, unpleaded issue is entering the case." *Id.*

The district court observed that Ross's argument for amending the complaint to add issues purportedly tried by consent was "based not so much on what evidence *she* presented on these claims but on the *defenses* that the Red Cross pursued at trial." The district court understood Ross to argue that, because the Red Cross "put such defenses as assumption of risk, informed consent, and comparative negligence into play," Ross's "unpleaded claims should also be deemed to be part of the case because these defenses could also be raised to rebut the unpleaded claims." The district court rejected Ross's argument on several grounds. First, the district court noted that it refused to instruct the jury on the defenses of assumption of risk and comparative negligence, meaning that these defenses were never before the jury for consideration. Second, the district court observed that the evidence Ross said was relevant to her unpleaded claims also was relevant to Ross's negligence claim. For example, the Red Cross used the "What You Must Know Before Giving Blood" pamphlet to demonstrate that it followed the applicable standard of care. Because this evidence and argument was relevant to pleaded issues, it "[did] not give 'fair notice' that unpleaded strict liability . . . claims were lurking at trial." Third, the district court said that the Red Cross "could have presented additional evidence as part of its defense case had it truly been on notice that [this

Page 29

theory] of liability [was] being tried." Finally, the district court noted that it expressly denied Ross's attempt to amend the complaint to add a strict liability claim prior to trial and concluded that "in light of the Court's ruling that [Ross] could *not* amend her complaint to add a strict liability claim, it would defy logic for the Court to now find that the Red Cross consented to try a strict liability claim at trial."



The district court did not abuse its discretion by ruling that the Red Cross did not impliedly consent to try Ross's strict liability claim and by concluding that Ross could not amend her complaint after trial. The district court did not abuse its discretion by denying Ross's request for a new trial.

## H.

Ross argues that she is entitled to a new trial in which her strict liability claim is tried, Moore is permitted to testify, spoliation sanctions are imposed on the Red Cross, and a *res ipsa loquitur* instruction is given to the jury. Ross claims that she was "denied a fair trial" due to the "cumulative effects" of the district court's errors.[13] Under cumulative-error analysis, "we consider the 'combined effect' of multiple trial errors to determine whether they are unfairly prejudicial." *Beck v. Haik,* 377 F.3d 624, 644 (6th Cir. 2004) (quoting *United States v. Parker,* 997 F.2d 219, 222 (6th Cir. 1993)), *overruled on other grounds by Adkins,* 554 F.3d 650. The district court did not err and, therefore, Ross was not denied a fair trial.

## IV.

Page 30

For these reasons, we affirm the district court's rulings and uphold the jury's verdict.

--------

Notes:

[*] The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

[1] Phlebotomy is "the therapeutic practice of opening a vein to draw blood." *American Heritage Dictionary* 931 (2d ed. 1982).

[2] The Red Cross is a federally chartered corporation that provides a variety of humanitarian services. *See* 36 U.S.C. §§ 300101-02. The Red Cross operates a nationwide blood bank that collects blood and blood components from donors and supplies it to hospitals for use in transfusions. The Red Cross's blood banking activities are subject to regulations enforced by the United States Food and Drug Administration ("FDA").

[3] A DRIR is:

a dynamic document in which entries are made memorializing the potential complications described by a donor, symptoms described by a donor, and conversations between the donor and the Red Cross. The types of information contained in a DRIR may include a description of general instructions given to a donor, and whether the donor is seeking medical care and from whom. After a DRIR is generated, it may be updated as time progresses to reflect further communications with a donor, if any.

The Red Cross is required to document donor complications pursuant to a consent decree (the "Consent Decree") reached by the Red Cross and the United States in *United States v. American National Red Cross,* No. 93-0949, 1993 WL 186094, at *1 (D.D.C. May 12, 1993). The case arose when the United States filed a complaint for permanent injunctive relief on behalf of the FDA alleging that the Red Cross violated the Federal Food, Drug, and


Exhibit B

Cosmetic Act, 21 U.S.C. § 301 *et seq.,* and the Public Health Service Act, 42 U.S.C. § 201 *et seq. Id.* The Consent Decree, which was amended in 2003, requires the Red Cross to follow certain policies and procedures regarding blood safety. *See id.* at *1-14.

[4] CRPS is "an uncommon form of chronic pain that usually affects an arm or leg." Mayo Clinic Staff, *Complex Regional Pain Syndrome,* MayoClinic.com (March 31, 2011), http://www.mayoclinic.com/health/complex-regional-pain-syndrome/DS00265. "[CRPS] typically develops after an injury, surgery, stroke or heart attack, but the pain is out of proportion to the severity of the initial injury, if any." *Id.* "The cause of [CRPS] isn't clearly understood." *Id.*

[5] Ross also argues in her reply brief that the district court erred by requiring bad faith to establish a "culpable state of mind" under *Beaven's* second prong and by failing to require the Red Cross to demonstrate lack of prejudice to Ross.

[6] Venipuncture is "puncture of a vein, as for drawing blood, intravenous feeding, or administration of medicine." *American Heritage Dictionary* 1341 (2d ed. 1982).

[7] Even if the district court had abused its discretion by disqualifying Moore, the district court properly held that Moore's proposed testimony could be excluded on two additional grounds. First, the district court held that Moore's proposed testimony consisted solely of inadmissible legal conclusions. Second, it held that Moore's proposed testimony was irrelevant because it related only to legal theories not presented in Ross's lawsuit.

[8] Ross claims that she moved three times prior to trial to amend her complaint to add a strict liability claim. This is incorrect. Ross attempted to add a strict liability claim once before trial. She twice asked the district court to allow her to amend the complaint to add a punitive damages claim as a spoliation sanction.

[9] In November 2011, Ross's current attorney, William C. Wilkinson, entered his appearance as counsel for Ross in place of Squire.

[10] Ross does not appeal the district court's determination with respect to her claims premised on negligence *per se* and violation of the Consent Decree.

[11] This claim differs from the claim that Ross unsuccessfully tried to add prior to trial because it is also based on failure to warn. The Red Cross observes that under Ohio law, strict liability for failure to warn only applies in the context of product liability cases. It argues that this is another reason why Ross's post-trial motion to amend the complaint was properly denied.

[12] Ross does not contest the district court's refusal to allow her to amend the complaint to add the other issues.

[13] Ross does not specifically challenge the jury's verdict by arguing, for example, that it is against the weight of the evidence or that it was influenced by prejudice or bias.

